IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DENNIS J. POTTER,                                  )
                                                   )
Plaintiff,                                         )
                                                   )
v.                                                 )
                                                   )        Case No. 4:12-cv-01002-SPM
                                                   )
                                                   )
CAROLYN W.  COLVIN,[1]                              )
Acting Commissioner of Social Security,            )
                                                   )
Defendant.                                         )


**MEMORANDUM OPINION**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the application of Plaintiff for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act").  The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 18).  Because I find the decision denying benefits was supported by substantial evidence, I affirm the Commissioner's denial of Plaintiff's application for benefits.

**I.        PROCEDURAL HISTORY**

On September 10, 2009, Plaintiff applied for SSI, alleging that he had been unable to work since October 8, 2006, due to chronic obstructive pulmonary disease (COPD), emphysema, back problems, tuberculosis, diabetes, schizophrenia, anxiety, bipolar disorder, and problems

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should therefore be substituted for Michael J. Astrue as the defendant in this case.

1

with concentration.  (Tr. 80, 137-39, 164).  On January 20, 2010, that application was initially denied.  (Tr. 80).  On March 5, 2010, Plaintiff filed a Request for Hearing by an Administrative Law Judge (ALJ).  (Tr. 91).  After a hearing on October 27, 2010, the ALJ issued an unfavorable decision on January 11, 2011.  (Tr. 13-22).  The Appeals Council denied review on April 20, 2012.  (Tr. 1-3).  Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.    FACTUAL BACKGROUND

### A.  BACKGROUND

On Oct. 27, 2010, Plaintiff appeared at a hearing before the ALJ.  Plaintiff was 47 years old at the time and had dropped out of school in the ninth grade.  (Tr. 48).  He was in special education classes when he was in school, and he can barely read and cannot write.  (Tr. 61).  He was five feet, eleven and a half inches tall, and weighed 230 pounds.  (Tr. 53).

Plaintiff testified that he worked as a roofer between 2001 and 2006, and that he had not worked since 2007.  He testified that he stopped working due to breathing problems, back problems, and "medical problems."  (Tr. 49).

Plaintiff testified that his mental problems give him more trouble that his physical problems.  He reported that he has been diagnosed as bipolar, which presents with symptoms of depression, panic attacks, and general difficulty getting along in life.  (Tr. 53).  He reported a history of manic episodes and having confusion "all the time."  (Tr. 54).  Since he was in second grade, he has been seeing things and hearing voices that tell him they are going to kill him or his son.  (Tr. 51, 55).  He testified that he had been held down by a demon that "made [him] a vision that there was a guy coming in [his] house to kill [him]."  (Tr. 56).  When he has panic attacks, his blood pressure goes up, he starts sweating, and he gets short of breath.  (Tr. 54).  He testified

that he can "barely" go out to shop at a grocery store, because he thinks everyone is staring at him and plotting against him, and he has panic attacks.  (Tr. 54-55).  He has visited COMTREA for mental problems but stopped going there because of problems finding rides and places to stay.  (Tr. 51).  Plaintiff testified that he told the psychiatrist at COMTREA that the medication was helping him, but he denied telling the psychiatrist he was no longer having problems with psychosis or paranoia.  (Tr. 52).

Plaintiff testified that he had been taking medication for his mental difficulties, but he stopped taking it when his Medicaid ran out two or three months before the hearing.  (Tr. 56). He testified that the medication "helped [him] some."  (Tr. 57).  When he was taking the medication, his mental problems were not as bad; he still had panic attacks, but he did not see things, and the only thing he heard was someone yelling his name.  (Tr. 56).

Plaintiff testified that he "can't breathe" and thinks he has throat cancer.  (Tr. 57-58).  He could only walk about fifty to seventy yards, because he can hardly breathe.  (Tr. 58).  Plaintiff testified that before his Medicaid ran out, he was using inhalers; since then, he has been using someone else's inhaler.  (Tr. 57).  He had received inhalers from a health clinic and had had a pulmonary function study performed at St. Joseph's Hospital in Festus.  (Tr. 51).

Plaintiff testified that he has diabetes and that he is supposed to monitor his blood sugar and take medications as needed, but he has not been doing so since "everything burned up" in his trailer.  (Tr. 52).  Plaintiff testified that his diabetes causes swelling in his legs, arm, and ankles, and itching in his feet.  It feels like there are needles poking his heels.  (Tr. 58).  He can hardly feel his left arm.  (Tr. 59).

When Plaintiff was in his twenties, he had a herniated disk and had back surgery.  His lower back hurts, and he has shooting pains down his left side.  In addition, he testified that he cannot feel the tops of his thighs and knees.  (Tr. 59).

About six months to a year before the hearing, Plaintiff went to the hospital for an infection in his face; he testified that his teeth fell out and he almost died from the infection.  (Tr. 60).

Plaintiff testified that he has gotten conflicting diagnoses about whether he has pneumonia or a heart problem.  (Tr. 60).

Plaintiff admitted to having had problems with alcohol in the past, but said it had been "three years ago one day" since he drank.  Plaintiff testified that he had received four DUIs but currently had a license.  He had not used marijuana in "probably a year."  (Tr. 50).

The ALJ noted that Plaintiff's testimony did not seem to bear much similarity to the medical evidence of record, and gave him thirty days to present further evidence on those points. (Tr. 62).

### B.  RECORDS OF TREATING SOURCES

On March 22, 2009, Plaintiff was seen at the Emergency Department of Jefferson Regional Medical Center ("JRMC"), complaining of tooth and jaw pain lasting three days, and he saw Dr. Scott Soerries, M.D.  Plaintiff was noted to have a respiratory disorder, but he denied a history of psychiatric problems and denied psychiatric complaints.  (Tr. 316-29).  He was given meperidine,[2] prescribed amoxicillin[3] and Vicodin,[4] and advised to follow up with a dentist.  (Tr. 328).

---

[2] Meperidine is used to relieve moderate to severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682117.html

The next day, Plaintiff went to St. Joseph Hospital, complaining of toothaches and facial swelling.  (Tr. 229).  He was admitted to St. Joseph Hospital and remained there for three days.  (Tr. 240).  He was given IV antibiotics and responded well to them.  It was noted that he had very poor dentition and needed a full mouth dental extraction but had no money for dental care.  (Tr. 232).  During Plaintiff's hospitalization, it was also noted that Plaintiff had shortness of breath on exertion; however, his lungs were clear to auscultation and he showed normal respiratory effort.  (Tr. 233-34).  It was also noted that Plaintiff had had a positive tuberculosis ("TB") test in the past but did not have any active pulmonary TB and had a negative chest X-ray.  Plaintiff reported no joint pain, stiffness, or back pain, and no focal tingling or numbness.  (Tr. 238).

During his hospitalization, Plaintiff was referred to Dr. Asif Habib, M.D., for a psychiatric consultation.  Plaintiff told Dr. Habib that he had been depressed for a long time but had been increasingly depressed for the past five months.  He reported depressed mood, anhedonia, poor energy, poor sleep, poor appetite, and poor concentration.  He stated that he hears someone calling his name and thinks people are talking about him all the time.  On mental status examination, he made fair eye contact, had a depressed mood with full affect, was positive for auditory hallucination and paranoia, and had limited judgment and insight.  (Tr. 236).  Dr. Habib diagnosed major depression, recurrent with psychotic feature, rule out schizoaffective disorder, and alcohol dependence in remission.  (Tr. 236-37).  Dr. Habib assigned a Global Assessment of Functioning ("GAF") score of 55 and stated that Plaintiff's GAF for the past year

---

[3] Amoxicillin is an antibiotic used to treat bacterial infections.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a685001.html.

[4] Vicodin is a brand name for a combination of acetaminophen and hydrocodone; it is used to relieve moderate to severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html.

was 65.[5]  He recommended continuing Xanax,[6] increasing Lexapro,[7] and starting Abilify.[8]  (Tr. 237).

At discharge on March 26, 2009, Plaintiff's diagnoses were facial cellulitis secondary to poor dentition, improved; hyperglycemia/newly diagnosed diabetes mellitus, tobacco dependence, history of positive purified protein derivative, and depression.  His medications on discharge were Lexapro, Abilify, glipizide,[9] Vicodin, INH,[10] vitamin B6, Lamisil,[11] and a nicotine patch.  (Tr. 240).

---

[5] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations."  *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994).  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *DSM-IV* 32.  A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *DSM-IV* 32.

[6] Xanax is a brand name for alprazolam, which is used to treat anxiety disorders and panic disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html.

[7] Lexapro is a trade name for escitalopram, a selective serotonin reuptake inhibitor (SSRI) used to treat depression and generalized anxiety disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html.

[8] Abilify is a trade name for aripiprazole, which is used to treat the symptoms of schizophrenia or as a supplemental antidepressant.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html.

[9] Glipizide is used to control blood sugar levels in diabetics.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684060.html.

[10] This appears to be a treatment related to his history of a past positive tuberculosis test.  (Tr. 238).

[11] Lamisil is a trade name for terbinafine, which is an antifungal agent used to treat fungal infections of the toenails.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699061.html.

On April 1, 2009, Plaintiff went to the St. Clare Health Center Emergency Department, complaining of severe shooting neck pain radiating to his left shoulder and arm, as well as tingling.  The pain was associated with an incident in which he rolled out of bed.  (Tr. 251).  He was prescribed tramadol[12] and cyclobenzaprine.[13]  (Tr. 249).

On April 4, 2009, Plaintiff went to the emergency department at JRMC, complaining of left neck pain radiating down his arm.  It was noted that he had been given tramadol and Flexeril (cyclobenzaprine) but still had a lot of pain.  (Tr. 302).  He was given Vicodin and advised to continue the Flexeril.  (Tr. 303).  His respiratory effort was mildly labored.  (Tr. 310).  He denied psychiatric complaints.  (Tr. 309).

On April 8, 2009, Plaintiff returned to the emergency department at St. Clare, complaining of swelling in his lower legs beginning three days earlier.  He also complained again of pain in the left side of his neck that radiated down his left arm.  (Tr. 263).  Plaintiff was diagnosed with cervical radiculopathy and prescribed Furosemide[14] and Methylprednisolone.[15] (Tr. 261, 269).

On April 20, 2009, Plaintiff returned to JRMC, complaining of left shoulder pain and requesting pain medication.  (Tr. 290, 294).  He denied psychiatric and respiratory complaints. (Tr. 296-97).  He was prescribed Flexeril.  (Tr. 293).

---

[12] Tramadol is an opiate agonist used to treat moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html.

[13] Cyclobenzaprine is a muscle relaxant used to relieve muscle pain and discomfort. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html.

[14] Furosemide is a "water pill" used to reduce swelling and fluid retention. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html.

[15] Methylprednisolone is a corticosteroid used to relieve inflammation. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html.

On June 9, 2009, Plaintiff returned to JRMC, complaining of shoulder pain.  He was requesting Vicodin but was informed that he would not be getting any narcotic pain medications; he stated that he understood and requested Flexeril.  (Tr. 276).  Plaintiff's active medications were noted, but no medication for mental impairments was reported.  (Tr. 280).  He denied psychological complaints.  (Tr. 283).

On August 31, 2009, Plaintiff saw Dr. Bharathi Raju, M.D. for his diabetes.  (Tr. 334-36). His respiratory effort was unremarkable, he had a full range of motion in his back without pain; and he had normal sensation and strength.  (Tr. 336).  Dr. Raju assessed Plaintiff as having uncontrolled diabetes, polyneuropathy in diabetes, and obesity.  He prescribed Avandamet[16] and advised Plaintiff to stop glipizide.  (Tr. 334).

On September 22, 2009, Plaintiff returned to Dr. Raju.  Notes and assessments were generally similar to those from the prior visit.  (Tr. 338-39).  Plaintiff was started on metformin. (Tr. 338).

On October 26, 2009, Plaintiff saw Dr. Guatam Rohatgi, D.O., a psychiatrist at COMTREA.  (Tr. 378-79).  Plaintiff reported that psychotropic medications were of benefit to him.  He presented with no visual, auditory, or other hallucinations; denied paranoia; and denied thought insertion or thought withdrawal.  He stated that his mood, sleep, and appetite were good. On mental status examination, his grooming and hygiene were fair to poor, but his behavior was cooperative, he had good eye contact; his affect was euthymic; and his thought content was devoid of delusions.  He was diagnosed with psychotic disorder, NOS, alcohol dependence, in early full remission; cannabis dependence, in early full remission; depression, NOS; and rule out substance-induced psychotic disorder versus schizoaffective disorder.  (Tr. 378).  It was noted

---

[16] Avandamet is a brand name for a medication containing metformin and rosiglitazone and is used to treat type 2 diabetes.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html.

that he had latent tuberculosis, diabetes, COPD, shoulder pain, back pain, and poor dentition. (Tr. 378-79).  He was told to continue with Abilify, citalopram, and Benadryl.  (Tr. 379).

On November 25, 2009, Plaintiff was seen by Dr. Jhansi Vasireddy, M.D., a psychiatrist at COMTREA, for medication management and supportive psychotherapy.  (Tr. 376-77).  He reported feeling tired and having trouble with his family members.  He reported hearing voices, feeling down sometimes, having paranoid ideations, and being anxious that people were talking about him.  He was taking Abilify for psychosis relief, and said that, though he was still hearing voices, they were not bothering him.  He denied command hallucinations and feelings of hopelessness or worthlessness.  When Dr. Vasireddy asked him how he spends his day, he responded: "sleeping or following my girlfriend."  On mental status examination, Plaintiff was mildly disheveled, with moderate eye contact, mild akathisia,[17] occasionally rapid speech, mild paranoid ideations, social anxiety, mild impairment of concentration and attention, limited insight and judgment, and a constricted mood/affect.  Plaintiff was noted to be cooperative, with a goal-directed thought process and no homicidal or suicidal ideation.  Dr. Vasireddy diagnosed Plaintiff with psychotic disorder NOS, rule out schizophrenia; alcohol dependence (in remission); cannabis dependence (in remission); and rule out schizoaffective disorder.  (Tr. 376). Dr. Vasireddy assessed a GAF score of 50.[18] Dr. Vasireddy recommended increasing Abilify, but Plaintiff did not want to be on an increased dose; he reported feeling okay and said that the voices were not bothering him.  Celexa (citalopram) was continued for depression.  (Tr. 377).

---

[17] Akathisia is a syndrome characterized by an inability to remain seated, with motor restlessness and a feeling of muscular quivering.  *Stedman's Medical Dictionary* 42 (28th ed. 2006)

[18] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *DSM-IV* 32.

On May 21, 2010, Plaintiff was discharged by COMTREA.  His attendance was noted to have been sporadic, and numerous no-shows were noted.  COMTREA no longer considered him a current patient.  (Tr. 371, 375).  Regarding the success of his treatment, he was noted to have remained abstinent with only one slip-up.  He had reported that he had no psychosis and mild paranoia.  He had denied depression.  Plaintiff was noted to have "dropped out of service" and had failed to respond to all attempts to contact him.  (Tr. 371-72).

### C. OPINION EVIDENCE AND CONSULTATIVE EXAMINATIONS

#### 1.   PSYCHOLOGICAL EVALUATION OF DR. THOMAS SPENCER, PSY. D. (DECEMBER 14, 2009)

On December 14, 2009, Plaintiff saw Thomas Spencer, Psy.D, for a psychological evaluation.  (Tr. 346-49).  Plaintiff reported that without medication, he hears voices, and that he last heard voices maybe a month prior.  He reported that he had been doing well, but then his house burned down.  He reported a long history of depression.  He also has manic episodes in which he becomes "grandiose."  He stated that he had lost his medication when his house burned down and that he had not taken anything since.  (Tr. 347).  Plaintiff reported having been sober for two years.  (Tr. 348).

Dr. Spencer noted that Plaintiff appeared disheveled and unshaven, that he smelled of cigarette smoke, and that he was restless and fidgety.  He had poor insight and judgment, and his speech was slurred at times.  (Tr. 348).  His affect was variable, and he broke down in tears a couple of times.  His thought patterns were noted to be circumstantial and tangential.  He did not present as paranoid, suspicious, hypervigilant, or grandiose.  He appeared to be "of low average intelligence at best" but "demonstrated a decent working knowledge of social norms."  Dr. Spencer diagnosed schizoaffective disorder, depressed type; alcohol dependence in sustained remission; and personality disorder NOS.  He assessed a GAF of 45 to 50.  Dr. Spencer opined

that Plaintiff retained the ability to understand and remember simple instructions and to engage in and persist with simple tasks.   However, Dr. Spencer stated that Plaintiff "demonstrated marked impairment in his ability to interact socially and adapt to change in the workplace."  He also opined that Plaintiff would need assistance in managing his benefits.  (Tr. 349).

### 2.   PSYCHIATRIC REVIEW TECHNIQUE FORM AND MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT OF DR. JOAN SINGER, PH.D. (JANUARY 20, 2010)

On January 20, 2010, Joan Singer, Ph.D. filled out a Psychiatric Review Technique Form for Plaintiff.  (Tr. 352-62).  She found that Plaintiff had schizoaffective disorder, anxiety, bipolar disorder, depression, personality disorder, and poly-substance dependence.  (Tr. 354-58).  Dr. Singer opined that Plaintiff had a mild restriction on activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.  She found that he had experienced no episodes of decompensation of extended duration.  (Tr. 360).

On the same day, Dr. Singer completed a Mental RFC Assessment.  (Tr. 363-65).  She noted that Plaintiff had moderate limitations in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the

11

ability to maintain socially-appropriate behavior and to adhere to basic standards of neatness and cleanliness; and the ability to respond appropriately to changes in the work setting.  In all other areas, she found that Plaintiff was not significantly limited.  (Tr. 363-64).  Finally, Dr. Singer noted, "Claimant could perform SRT on a sustained basis away from the general public."  (Tr. 365).

### C.  VOCATIONAL EVIDENCE

Vocational Expert ("VE") Delores Gonzales testified at the hearing before the ALJ.  The ALJ described the following hypothetical individual:

> [W]e've got a hypothetical claimant who was 43 at the alleged date of onset with an 8th grade education, same past relevant work.  It's been opined that this hypothetical claimant is able to perform a full range of light work but should avoid concentrated exposure to fumes, odors, dust and gases.  In addition this hypothetical claimant is able to understand, remember and carry out at least simple instructions and non-detailed tasks, should not work in a setting which includes constant, regular contact with the general public, should not perform work which includes more than infrequent handling of customer complaints and should not work in close proximity to alcohol or controlled substances, in addition he has limited reading skills.

(Tr. 62-63).  The VE testified that such an individual would be unable to perform Plaintiff's past relevant work but could perform other jobs such as electrode cleaner and hand presser.  Plaintiff's attorney asked whether, if that individual had a marked impairment in his ability to interact socially and adapt to change in the workplace, that would alter her answer.  (Tr. 63).  She responded that the inability to interact socially would not interfere with the jobs she had cited.  She also stated that she "did not know that [the impaired ability to adapt to changes in the workplace] would be pertinent" in the job settings she had mentioned, which were one and two-step jobs.  (Tr. 63-64).

### III.      STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits.  20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled.  20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611.  At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611.  At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 416.920(a)(4)(iii).  If the claimant

has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process.  20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 416.920(e).  At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step.  *Id.*  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. § 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.    DECISION OF THE ALJ

The ALJ found that Plaintiff had not engaged in substantial gainful activity since September 10, 2009, the date of application for benefits.  He found that Plaintiff had severe impairments of obesity, schizoaffective personality disorder, history of tobacco abuse, and breathing difficulties.  (Tr. 15).  He found that Plaintiff did not have an impairment or

combination of impairments that meets or medically equals any of the listed impairments in 20 C.F.R. Part 404, Subpart P, and Appendix 1.  (Tr. 16).  He found that Plaintiff had RFC "to perform the full range of light work as defined in 20 C.F.R. [§] 416.967(b) except he must avoid concentrated exposure to fumes, odors, dust and gases.  [Plaintiff] can understand, remember, and carry out at least simple instructions and non-detailed tasks.  He should not work in a setting which includes constant/regular contact with the general public or more than infrequent handling of customer complaints.  He should not work in close proximity to alcohol or controlled substances[.]  He cannot work any position which requires more than limited reading skills." (Tr. 17).  The ALJ found that Plaintiff had no past relevant work.  (Tr. 21).  Relying on the testimony of the vocational expert, he found that Plaintiff was capable of making a successful adjustment to work that exists in sufficient numbers in the national and local economy. Therefore, the ALJ determined that Plaintiff has not been under a disability, as defined in the Act, from the alleged onset date through the date of decision.  (Tr. 22).

## V.    DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).  "Substantial evidence 'is less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).  In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that

decision and evidence that detracts from that decision.  *Id.*  However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'"  *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).   "'If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'"  *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B.  THE ALJ'S STEP THREE FINDINGS

Plaintiff first argues that the ALJ erred by finding that he did not meet Listing 12.03 (Schizophrenic, Paranoid and Other Psychotic Disorders) or Listing 12.04 (Affective Disorders).

The burden of proof is on the claimant to establish that his or her impairment meets or equals a listing.  *See Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir. 1998).  As Plaintiff acknowledges, to satisfy the criteria of either Listing 12.03 (Schizophrenic, Paranoid and Other Psychotic Disorders) or Listing 12.04 (Affective Disorders), Plaintiff has the burden of satisfying either the requirements of Paragraphs A and B of the relevant listing, or the requirements of Paragraph C of the relevant listing.

The requirements of Paragraph B are the same for Listing 12.03 and 12.04: the claimant must have at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  In making his finding that Plaintiff did not meet or medically equal Listing 12.04, the ALJ made express findings regarding each of these areas, finding mild restriction of

activities of daily living; moderate difficulties in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration.  (Tr. 16).

Plaintiff argues that he satisfied requirement (2), citing the opinion of consultative examiner Dr. Spencer that Plaintiff "demonstrated marked impairment in his ability to interact socially and adapt to change in the workplace."  (Tr. 349).  Plaintiff also notes that some of his GAF scores ranged from 45 to 50, indicating serious impairments in social functioning.  (Doc. 14, Pl.'s Br. at 12).  The Court acknowledges that Dr. Spencer's finding and some of Plaintiff's GAF scores tend to support Plaintiff's argument regarding requirement (2).  However, there is conflicting evidence in the record that supports the ALJ's decision.  Dr. Singer, a non-examining psychologist, opined that Plaintiff had only moderate limitations in this area.  (Tr. 360).  In addition, Dr. Habib, who evaluated and treated Plaintiff, assigned GAF scores of 55 and 65, which indicated only mild or moderate difficulties in social, occupational, or school functioning. (Tr. 237).  The Court finds that there was substantial evidence to support the ALJ's conclusion and that his finding fell within the available "zone of choice."  *See Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) ("[T]his Court will disturb the ALJ's decision only if it falls outside the available 'zone of choice.'").

Moreover, even assuming *arguendo* that Plaintiff does satisfy requirement (2), Plaintiff cannot establish that he met any of the other Paragraph B criteria.  The only other Paragraph B criterion that Plaintiff discusses in his brief is requirement (3); he appears to suggest that Dr. Spencer's opinion that Plaintiff would "need assistance in managing his benefits" necessarily establishes that Plaintiff had "marked" difficulties in maintaining concentration, persistence, or pace.  The Court disagrees.  Elsewhere in his opinion, Dr. Spencer specifically opined that

17

Plaintiff "retains the ability to engage in and *persist with* simple tasks" and "retains the ability to understand and remember simple instructions."  (Tr. 349) (emphasis added).  Those statements are consistent with a finding of mild or moderate limitations in this area, not marked limitations. In addition, the ALJ's finding of mild limitations is supported by the opinion of Dr. Singer that Plaintiff had only mild limitations in this area.  (Tr. 360).

The Court further notes that the ALJ's finding with regard to requirement (1) that Plaintiff had only mild restriction in the activities of daily living is supported by substantial evidence, including the opinion of psychologist Dr. Singer; Plaintiff's reports that he took care of his adult son, because his son had "head problems"; and Plaintiff's reports that he could perform personal care activities, could drive, could go out alone, and could shop for food.  (Tr. 16, 172-73, 175).

Finally, the ALJ's finding with regard to requirement (4) is supported by the opinion of Dr. Singer, as well as by the absence of any evidence in the medical record documenting episodes of decompensation of extended duration.  (Tr. 360).

In sum, the ALJ's finding that Plaintiff did not satisfy the Paragraph B criteria of Listing 12.03 or 12.04 is supported by substantial evidence, and the Court need not reach the question of whether he satisfied the Paragraph A criteria.

To satisfy the "Paragraph C" criteria of Listing 12.03 or Listing 12.04, Plaintiff would have to establish the following:

> Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder [or, for Listing 12.04, a chronic affective disorder] of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.  Repeated episodes of decompensation, each of extended duration; or

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P., App'x 1, §§ 12.03, 12.04.  Plaintiff does not argue that he meets any of these criteria, nor does the record contain evidence suggesting that he meets these criteria. The Court also notes that Dr. Singer found that Plaintiff did not satisfy the Paragraph C criteria. (Tr. 361).

In sum, the Court finds that the ALJ's Step Three findings are supported by substantial evidence in the record as a whole.

### C.  THE ALJ'S RFC DETERMINATION

Plaintiff next makes several specific arguments challenging the ALJ's RFC determination.  Plaintiff first argues that the ALJ erred by failing to develop the record regarding Plaintiff's mental issues.  It is true that an "ALJ bears responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2000) (citing *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)).  However, "this duty is not never-ending and an ALJ is not required to disprove every possible impairment." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011).  Furthermore, a record is not necessarily undeveloped simply because it fails to support the claimant's claims. *Eichelberger v. Barnhart*, 390 F.3d 584, 592 (8th Cir. 2004).

19

The Court finds no failure to develop the record in this case.  The record contained Plaintiff's mental health treatment records, including psychiatric evaluations from at least two different physicians; a detailed evaluation by a consultative examiner, psychologist Dr. Spencer; and a Psychiatric Review Technique form and Mental RFC Assessment by a non-examining psychologist, Dr. Singer.  There is no indication that the ALJ felt unable to assess Plaintiff's RFC based on the evidence in the record, nor does Plaintiff indicate what medical evidence the ALJ should have obtained.  *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("Without informing the court what additional medical evidence should be obtained . . . , Ellis has failed to establish that the ALJ's alleged failure to fully develop the record resulted in prejudice, and has therefore provided no basis for remanding for additional evidence.").  The ALJ was not obligated to further develop the record in this case.

Plaintiff's second argument is apparently that the ALJ ignored the opinion of the consultative examiner, Dr. Spencer.  First, the ALJ provided in his opinion a detailed summary of Dr. Spencer's opinion, demonstrating that he did not "ignore" it.  (Tr. 19).  Second, the ALJ's RFC finding incorporates some of the limitations in Dr. Spencer's opinion.  The ALJ's finding that Plaintiff "can understand, remember, and carry out at least simple instructions and non-detailed tasks" closely tracks Dr. Spencer's opinion that Plaintiff "retains the ability to understand and remember simple instructions" and "retains the ability to engage in and persist with simple tasks."  (Tr. 17, 349).  In addition, the RFC includes the limitation that Plaintiff "should not work in a setting which includes constant/regular contact with the general public or more than infrequent handling of customer complaints."  (Tr. 17).  That statement suggests that the ALJ gave some weight to Dr. Spencer's opinion that Plaintiff "demonstrated marked impairment in his ability to interact socially and adapt to changes in the workplace."  (Tr. 349).

Because the ALJ discussed Dr. Spencer's opinions and it is clear that he gave them some weight in formulating the RFC, the Court concludes that the ALJ adequately considered the opinion of Dr. Spencer.  *See Comstock v. Astrue*, No. C12-4013-LTS, 2013 WL 563520 at *13-14 (N.D. Iowa, 2013) (holding that the ALJ had properly considered opinion of a consultative psychological examiner where such opinion was discussed and clearly had an effect on the final RFC determination); *see also Ellis v. Barnhart,* 392 F.3d 988, 994 (8th Cir. 2005) (finding that the limitations included in the RFC indicated that the ALJ gave "some credit" to a physician's medical opinions).

The Court acknowledges that the ALJ did not explain the specific weight he gave to Dr. Spencer's opinions, instead stating only that "considerable weight is afforded to the claimant's treating and examining physicians, consultative examiners and the remainder of the record."  (Tr. 21).   However, "the ALJ's failure to specifically articulate the amount of weight given to [a particular physician's] opinions is not dispositive."  *Snyder v. Astrue*, No. 11-0631-CV-W-REL-SSA, 2012 WL 4425335 at *20 (W.D. Mo. 2012) (citing *Wildman v. Astrue,* 596 F.3d 959, 966 (8th Cir. 2010)); *see also Kresyman v. Astrue*, No. 09-00507-CV-W-NKL, 2010 WL 670248 at *5 (W.D. Mo. 2010) (rejecting claimant's argument that the ALJ must explicitly state the weight given to each medical opinion and finding that the ALJ's detailed examination of the medical record made clear the weight afforded to the medical opinions).   Here, it is clear that the ALJ thoroughly considered Dr. Spencer's opinion and gave significant weight to portions of that opinion.

Plaintiff also suggests that the ALJ improperly substituted his own opinions for those of Plaintiff's treating and consulting psychologists and psychiatrists in determining Plaintiff's RFC. As discussed above, the ALJ included some of the consultative examiner's limitations in

Plaintiff's RFC, and his RFC was also consistent with the limitations included in Dr. Singer's Mental RFC Assessment.   The ALJ also properly considered Plaintiff's medical records (including GAF scores assigned by treating physicians), the lack of functional restrictions imposed by Plaintiff's treating physicians, and Plaintiff's failure to seek treatment on a regular basis.  (Tr. 17-21).  *See Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." (quotation marks omitted)).  The Court finds that the ALJ did not improperly substitute his opinion for those of the medical experts.  *See Stormo v. Barnhart*, 377 F.3d 801, 808 (8th Cir. 2004) (rejecting the argument that the ALJ substituted his own opinion for those of medical experts where the ALJ's RFC was supported by the opinions of state agency physicians and other medical evidence).

## VI.   CONCLUSION

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence.  Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

/s/ Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of August, 2013.